UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------X
DOROTHY TURANSKY-FRANCES,

                    Plaintiff,                 MEMORANDUM & ORDER
                                               17-CV-2548(JS)(ARL)
      -against-

UNITED STATES OF AMERICA,

                    Defendant.
-------------------------------X
APPEARANCES
For Plaintiff:       Howard R. Cohen, Esq.
                     Michael Krigsfeld, Esq.
                     Steven Hoffman, Esq.
                     William Schwitzer and Associates, P.C.
                     820 2nd Avenue, Suite 10th Floor
                     New York, New York  10017

                     George Joseph Pfluger, Esq.
                     William Schwitzer and Associates, P.C.
                     112 Calypso Drive
                     Lakeway, Texas  78734

                     Albert K. Kim, Esq.
                     Elefterakis, Elefterakis and Panek
                     80 Pine Street, 38th Floor
                     New York, New York  10005

For Defendant:       Megan Jeanette Freismuth, Esq.
                     James H. Knapp, Esq.
                     United States Attorney's Office
                     610 Federal Plaza
                     Central Islip, New York  11722


SEYBERT, District Judge:

        Dorothy Turansky-Frances ("Plaintiff") commenced this

action against the United States of America ("Defendant") pursuant

to the Federal Tort Claims Act ("FTCA"), alleging she was injured

in a motor vehicle accident caused by a negligent United States

Postal Service ("USPS") employee.  Currently pending before the Court are the parties' cross-motions for summary judgment. Plaintiff has moved for summary judgment on the issue of liability and Defendant has cross-moved on the issues of damages and causation.  (Pl. Mot., ECF No. 45; Def. Mot., ECF No. 42.)  For the following reasons, Plaintiff's motion is GRANTED and Defendant's motion is GRANTED IN PART AND DENIED IN PART.

<u>BACKGROUND</u>[1]

I.   <u>The Accident</u>

On August 31, 2015 at approximately 6:00 p.m., Plaintiff was involved in a motor vehicle accident at the intersection of Neptune Avenue and Ladonia Street in Nassau County, New York. (Def. 56.1 Stmt. ¶ 2; Pl. 56.1 Stmt. ¶¶ 1, 2.)  At the time of the collision, Plaintiff was operating a 2006 Ford Mustang which came into contact with a Long-Life Vehicle owned by USPS. (Pl. 56.1 Stmt. ¶¶ 2-3.)  The Long-Life Vehicle was operated by a USPS employee, Christopher Daley, who was driving the Vehicle in the

---

[1] The facts are drawn from the parties' Local Rule 56.1 Statements and Counterstatements. (<u>See</u> Def. 56.1 Stmt., ECF No. 43-1; Pl. 56.1 Counterstmt., ECF No. 44; Pl. 56.1 Stmt., ECF No. 45-14; Def. 56.1 Counterstmt., ECF No. 45-15.)  Unless otherwise stated, a standalone citation to a Rule 56.1 Statement or Counterstatement denotes that either the parties agree or the Court has determined that the underlying factual allegation is undisputed.  Citation to a party's Rule 56.1 Statement or Counterstatement incorporates by reference any document cited therein.

course of his employment for USPS as a full-time City Carrier Assistant. (Id. ¶¶ 3, 22-23.)

The intersection where the accident occurred was controlled by a stop sign. (Id. ¶ 35.) The parties do not dispute that Plaintiff brought her vehicle to a complete stop at the stop sign and that her stopped vehicle was hit from behind by Daley. (See id. ¶¶ 14-16, 37.) However, the parties dispute where the accident occurred within the intersection. According to Plaintiff, the accident occurred while she was stopped at the stop sign. (See id. ¶¶ 14-15.) On the other hand, Daley contends that he brought his vehicle to a stop behind Plaintiff's at the stop sign without incident. (See Def. 56.1 Counterstmt. ¶ 38.) According to Daley, after she stopped at the stop sign, Plaintiff continued 5 to 10 meters into the intersection and he followed, driving approximately half of a car length behind at a speed of 15 to 20 miles per hour. (See id. ¶ 47; Daley Depo. Tr., ECF No. 45-8, at 52.) Then, as both vehicles proceeded into the intersection, Daley claims that Plaintiff brought her vehicle to a sudden stop. (See Def. 56.1 Counterstmt. ¶¶ 39, 45, 47.) He applied his brake to attempt to avoid colliding into Plaintiff, but he was unable to prevent the accident from occurring. (Id. ¶ 42.)

II.   Plaintiff's Medical History

    A.   Pre-Accident Medical Treatment

        1.   Dr. Benatar and Dr. Kirschen

In April 2009, Plaintiff saw David Benatar, M.D., and complained of pain in her left wrist as well as pain along her left thumb that had existed for about one year. (Def. 56.1 Stmt. ¶ 3.)   Plaintiff saw Dr. Benatar again in October 2012 with complaints of neck pain radiating toward the right scapula and right trapezii region. (Id. ¶ 6.)   He reviewed cervical x-rays which revealed "loss of lordosis and degenerative changes, most severe at C6-7, mildly at other levels" and noted these were "age appropriate degenerative changes." (Id. ¶ 7.)   Plaintiff was then referred to a physical therapist who, at an initial consultation, assessed Plaintiff's range of motion in her cervical spine as: "flexion 45 degrees; extension 20 degrees; right lateral flexion 25 degrees; left lateral flexion 35 degrees; right lateral rotation 50 degrees; left lateral rotation 60 degrees." (Id. ¶¶ 11-12.)

At a March 2013 visit, Plaintiff complained of pain in her neck that radiated into her right shoulder and upper arm. (Id. ¶ 14.)   Dr. Benatar assessed Plaintiff with cervical disc syndrome with radiculopathy and suggested that she have an MRI scan. (Id. ¶ 15.)   On March 19, 2013, Plaintiff had an MRI that revealed multilevel degenerative disc desiccation with disc space narrowing at C5-6; very minimal disc bulging at C2-3, C3-4, and C4-5; a disc

bulge and small protrusion mildly indent the thecal sac without compression of the spinal cord at C5-6; and moderate spinal stenosis at C6-7 with no significant cord compression. (Id. ¶ 16.) Plaintiff continued to see Dr. Benatar almost every month from March 2013 through October 2013 due to complaints of pain in either her neck or back. (Id. ¶¶ 17-37.) Throughout this time, Dr. Benatar assessed cervical and lumbar radiculopathy (id. ¶¶ 18, 20, 26, 28, 34), low back syndrome (id. ¶ 23), sciatic radiation (id. ¶ 26), and "slight diminution in sensation in the posterior aspect of the right arm and right forearm in the C5-6-7 dermatomes" (id. ¶ 30). Plaintiff underwent a second MRI on September 4, 2013, which revealed no significant changes since the first scan in March 2013. (See Pl. 56.1 Counterstmt. ¶ 31.)

Plaintiff saw Dr. Benatar again in March 2014 and complained of occasional cervical pain as well as lower back pain that radiated to her right hip and thigh. (Def. 56.1 Stmt. ¶ 38.) He assessed Plaintiff with low back syndrome with right sciatica. (Id. ¶ 39.) At this point, Plaintiff resumed monthly or even bi-monthly visits until December 2014. (Id. ¶¶ 38-82.) In April 2014, Plaintiff complained of radiating neck and back pain, difficulties turning her head, and pain extending to her fingers. (Id. ¶¶ 41-42.) In addition to low back syndrome with right sciatica, Dr. Benatar also assessed cervical disc syndrome with left and right radiculopathy and degenerative disc disease

throughout the cervical spine.  (Id. ¶ 43.)  He also renewed Plaintiff's Percocet prescription, as she requested.  (Id. ¶ 45.) In May 2014, Plaintiff complained of neck pain that radiated into her right shoulder and arm, difficulty turning her head, and stiffness that interfered with her ability to sleep.  (Id. ¶ 46.) She was assessed with cervical sprain with cervical radiculopathy and low back syndrome with right- and left-sided lumbar radiculopathy.  (Id. ¶ 47.)

A June 20, 2014 MRI of Plaintiff's lumbar spine revealed mild degenerative disc disease and facet arthropathy.  (Id. ¶ 48.) Several days later, Plaintiff saw Dr. Benatar, and renewed her complaints of radiating neck pain and difficulty turning her head. (Id. ¶ 49.)  She was diagnosed with cervical radiculopathy, lumbar radiculopathy, and low back syndrome based upon degenerative changes.  (See id. ¶ 50.)  Dr. Benatar also "explained to Plaintiff that she cannot obtain prescriptions from other doctors, which she has done in the past.  If the pharmacist notifies him of any extra prescriptions, he will discontinue all her prescriptions."  (Id. ¶ 51.)  At Plaintiff's next visit in July, she complained of radiating lower back pain and was assessed with low back syndrome with sciatica and cervical disc syndrome with cervical radiculopathy.  (Id. ¶¶ 52-53.)  Dr. Benatar's notes from that day stated Plaintiff is a heavy user of "drugs" and that he has discussed the "drug use" with her.  (Id. ¶ 54.)  Plaintiff's

complaints of pain in July were similar to that of her complaints from the prior month, and she was assessed with low back syndrome with sciatica.  (Id. ¶¶ 55-56.)

Plaintiff then saw Dr. Neil B. Kirschen, M.D. in August 2014 with complaints of chronic lower back pain and numbness in her fourth left toe.  (Id. ¶ 58.)  She was assessed with thoracic or lumbosacral neuritis or radiculitis and lumbar radiculopathy, and Dr. Kirschen administered a lumbar epidural steroid injection. (Id.  ¶¶ 59-60.)  Several weeks later on September 3, 2014, Plaintiff saw Dr. Benatar with complaints of pain in her lower back and in the right side of her neck.  (Id. ¶ 61.)  He advised Plaintiff to return to physical therapy.  (Id. ¶ 62.)  Plaintiff then saw Dr. Kirschen again on September 17, 2014 and he administered another steroid injection.  (Id. ¶ 63.)

On October 1, 2014, Plaintiff saw Dr. Benatar and complained of low back pain radiating to her right hip and thigh, occasional pain in her right foot, numbness in the tips of her toes, stiffness of her cervical spine, and difficulty turning her head to the right.  (Id. ¶ 64.)  Dr. Benatar assessed low back syndrome with right sciatica and cervical radiculopathy.  (Id. ¶ 65.)  He advised Plaintiff that she should be evaluated by a neurologist. (Id. ¶ 66.)  She underwent an electrodiagnostic study on October 29, 2014 that revealed evidence of acute bilateral L5 radiculopathy.  (Id. ¶ 67.)  The following month, Plaintiff

complained to Dr. Benatar of lower back pain as well as stiffness
and radiating neck pain.  (Id. ¶ 68.)  She was once again assessed
with right sciatica, chronic low back syndrome, and cervical
radiculopathy.  (Id. ¶ 69.)  Dr. Benatar had another discussion
with Plaintiff about her drug use and advised her to "eliminate
the heavy drug use."  (Id. ¶ 70.)  The topic of Plaintiff's drug
use carried over into her next visit with Dr. Benatar in December
2014, at which time Plaintiff complained of bilateral foot pain
that was assessed as radiculopathy.  (Id. ¶¶ 71-73.)  Dr. Benatar
noted that he had a "very long conversation" with Plaintiff that
was difficult because of her Percocet use and that he advised her
to speak with Dr. Kirschen about stopping medication.  (Id.
¶¶ 72-73.)

> 2.   PA Sumner and Dr. Shah

Plaintiff then began to see Bethany Sumner, PA-C in
January 2015 for lower back pain and for the renewal of pain
medication.  (Id. ¶ 75.)  At this time, Plaintiff described her
lower back pain as dull, aching, and radiating.  (Id. ¶ 76.)  She
also complained of sleeping difficulties.  (Id.)  As a result, PA
Sumner referred Plaintiff to Dr. Trusha Shah, M.D., a pain
management doctor, to evaluate her for management of narcotic
analgesics.  (Id. ¶ 77.)  Plaintiff saw Dr. Shah on February 12,
2015 and complained of "pain primarily in the neck and shoulders"
"but now is in the lower back" as well as numbness and tingling in

her toes.  (Id. ¶¶ 78-79.)  Dr. Shah advised Plaintiff that she would take over writing the prescriptions for Plaintiff's medications.  (Id. ¶ 82.)

Plaintiff's next visit with Dr. Shah was on June 9, 2015 at which time Plaintiff only complained of bilateral hand pain that radiated into her thumb.  (Id. ¶ 83.)  The following month, on July 7, 2015, Plaintiff told Dr. Shah she had pain in her right buttock and increasing pain in her right arm and shoulder.  (Id. ¶ 84.)  Dr. Shah "scheduled a right sacroiliac joint injection [which was ultimately administered on July 24, 2015] and increased [Plaintiff's] oxycodone" prescription.  (Id. ¶¶ 85-86.)  Plaintiff then saw Dr. Shah on August 3, 2015, due to numbness in her toes. (Id. ¶ 87.)  Dr. Shah planned to schedule Plaintiff for an epidural steroid injection.  (Id. ¶ 88.)

    B.   Post-Accident Medical Treatment

After the August 31, 2015 collision, Plaintiff called 9-1-1 and an ambulance arrived at the scene.  (See Def. 56.1 Stmt. ¶ 91.)  She was taken to the emergency room at St. Joseph Hospital where she complained of neck and right shoulder pain as well as "some tingling in her feet," a sensation she "normally has." Plaintiff did not complain of back pain nor was Plaintiff diagnosed with any fractures or broken bones.  (Id. ¶¶ 92-94, 95; Pl. 56.1 Counterstmt. ¶ 233.)

On September 4, 2015, Dr. Shah administered the steroid injection that she had discussed with Plaintiff prior to the accident.  (See Def. 56.1 Stmt. ¶¶ 99-100.)  Plaintiff next saw Dr. Shah on September 8, 2015 and complained of lower thoracic and neck pain, which Dr. Shah assessed a "VAS Pain," score of six out of ten.  (See Def. 56.1 Stmt. ¶ 101; Shah Medical Records, ECF No. 43-8, at 18.)  Dr. Shah's notes do not refer to the car accident.

The next day, Plaintiff underwent an MRI of the cervical spine that revealed straightening of the cervical lordosis with broad-based left paracentral herniation in addition to diffuse disc bulging and bony ridging at C5-6 resulting in cord impingement, left exiting nerve root impingement and right exiting nerve root encroachment at C6-7. (Def. 56.1 Stmt. ¶ 103; Sept. 9, 2015 MRI Rpt., ECF No. 43-9.)  The MRI also confirmed there was no acute fracture or spinal cord compression.  (See Pl. 56.1 Counterstmt. ¶ 103; Sept. 9, 2015 MRI Rpt.)  Plaintiff underwent an MRI of her thoracic spine shortly thereafter which revealed right paracentral protrusion at T9-T10 without cord or exiting nerve root impingement and suggested degenerative changes in lower cervical spine at C5-6.  (See Def. 56.1 Stmt. ¶ 105.)

At some point after the accident, Plaintiff's primary care physician, Natalie Cher, D.O., referred Plaintiff to an orthopedic specialist, Luis Alejo, M.D.  (See Def. 56.1 Stmt. ¶ 98.)  At Plaintiff's first appointment with Dr. Alejo on

September 14, 2015 she complained of pain in her neck and right shoulder and mid-back; however, she did not complain of lumbar pain.  (Id. ¶¶ 106-07, 113.)   Dr. Alejo assessed cervicalgia, thoracic spine and right shoulder pain, and referred Plaintiff to physical therapy.  (Id. ¶¶ 109-10.)   He made similar diagnoses during two other appointments that same month.  (Id. ¶¶ 115, 117-19.)

In October 2015, Plaintiff saw Dr. Shah three times. During the first visit, Plaintiff noted improvement in her back and legs, but still complained of pain in the lower back, and pain concentrated in the left neck and arm.  (Id. ¶ 120.)   Dr. Shah attributed the weather as a factor that increased Plaintiff's pain. (Id. ¶ 121.)   At the second visit, Plaintiff complained of neck pain and Dr. Shah indicated that Plaintiff had "moderate tenderness to touch along the C4, C5, and C6 spinous process" with extension and lateral rotation to the right side reproducing Plaintiff's pain, which radiated into the neck and the shoulders.  (Pl. 56.1 Counterstmt. ¶ 124.)   Dr. Shah assessed cervical radiculopathy. (Def. 56.1 Stmt. ¶ 125.)   Then, at the third visit, Dr. Shah administered a cervical epidural steroid injection.  (Def. 56.1 Stmt. ¶ 126.)

Plaintiff returned to Dr. Alejo on November 4, 2015 with complaints of pain in the neck and thoracic spine.  (Id. ¶ 127.) He assessed cervical radiculopathy and pain in the thoracic spine.

(Id. ¶ 128.)  On December 1, 2015, Plaintiff followed-up with Dr. Shah and rated her neck pain a five out of ten.  (Id. ¶ 130.) Plaintiff was given a cervical epidural steroid injection that provided her with relief.  (Pl. 56.1 Counterstmt. ¶ 130.)  Then, Plaintiff saw Dr. Alejo on December 16, 2015 and January 27, 2016. (Def. 56.1 Stmt. ¶¶ 131-32.)  She complained of neck and thoracic spine pain and Dr. Alejo assessed cervical radiculopathy and pain in the thoracic spine on each visit.  (Id.)

Beginning in February 2016, Plaintiff treated with Dr. Shah on a near-monthly basis through July 2016.  In February 2016, Plaintiff complained of neck pain and Dr. Shah assessed ongoing cervical radiculopathy.  (Id. 134-35.)  In March 2016, Plaintiff saw Dr. Shah for medication management and rated her neck pain as a three out of ten.   (Id. ¶ 137, 140.)  Dr. Shah noted that Plaintiff underwent liposuction and was prescribed Tylenol and codeine.   (Id. ¶ 138.)  Dr. Shah assessed resolving cervical radiculopathy, lumbar radiculopathy, and "SI joint sacroiliitis." (Id. ¶ 141.) Plaintiff was also advised that if she obtained opioid medications from other physicians, she would be discharged from Dr. Shah's practice.  (Id. ¶ 139.)  Plaintiff returned to Dr. Shah later that month with complaints of radiating right-sided neck pain that went into her shoulder and sometimes caused numbness in her hand.   (Id. ¶ 142.)  Dr. Shah assessed cervical facet arthropathy and scheduled right-sided C4, C5, and C6 facet

injections.   (Id. ¶ 143.)   The injections were administered on April 8, 2016.  (Id. ¶ 144.)  During a post-injection follow-up on April 26, 2016, Plaintiff complained of mid-thoracic back pain; however, she felt 65% relief with her neck and her shoulder pain. (Id. ¶¶ 145-46; Pl. Counterstmt. ¶ 145.)   Dr. Shah assessed resolving cervical facet arthropathy, thoracic paraspinal tenderness, and thoracic radiculopathy.  (Def. 56.1 Stmt. ¶ 147.) The following month, Plaintiff complained of severe lower back pain and Dr. Shah noted Plaintiff's pain was relieved 80% due to the injection administered in April 2016.  (Id. ¶ 148.)  Dr. Shah assessed right-sided cervical facet arthropathy and lumbar myositis.  (Id. ¶ 149.)   Then, in June and July 2016, Plaintiff complained of neck and mid-thoracic spine pain.  (Id. ¶¶ 150-51.) In addition to cervical facet arthropathy, Dr. Shah assessed cervical myalgia.  (Id. ¶ 152.)

Plaintiff returned to Dr. Alejo on August 28, 2016, complaining of neck pain.  (Id. ¶ 157.)  Dr. Alejo noted that the "problem has been gradually worsening" and that the "pain is associated with a[] [motor vehicle accident]."  (Pl. 56.1 Counterstmt. ¶ 157.)  He assessed cervical radiculopathy due to intervertebral disc disorder and noted that Plaintiff "had been dropped by her pain management doctor."  (Def. 56.1 Stmt. ¶¶ 158-59.)  She was given a list of other pain management doctors but was not accepted by any of them.  (Id. ¶ 160.)  Dr. Alejo

recommended that she ween from Percocet and referred her to another pain management doctor, Aristide Burducea, D.O., for a second opinion.  (Id. ¶ 161.)

Plaintiff underwent a MRI of the cervical spine on August 31, 2016 that revealed "straightening of the cervical lordosis and multilevel disc bulging with disc herniations in the lower cervical spine resulting in left greater than right cord impingement and left greater than right exiting C6 nerve root impingement at C5-6" as well as "right greater than left cord impingement with bilateral exiting C7 nerve root encroachment left greater than right at C6-7."  (Id. ¶ 162.)

On September 8, 2016, Plaintiff complained of neck pain to Dr. Alejo, and his assessment remained unchanged from the last visit.  (Id. ¶¶ 163-64.)  Plaintiff then saw Dr. Burducea on September 13, 2016 and maintained her complaint of neck pain.  (Id. ¶ 165.)  Upon examination, Dr. Burducea found moderate radicular pain on the right only; fully and asymptomatic cervical spine extension to 60 degrees; restricted right lateral flexion with moderate posterior and lateral neck pain; full and asymptomatic right lateral rotation to 80 degrees; and left lateral flexion and rotation full and asymptomatic.  (Id. ¶ 166.)  Plaintiff's lumbar spine was normal and had full range of motion.  (Id. ¶ 168.)  Dr. Burducea assessed cervical region radiculopathy, "other long term (current) drug therapy," and "spondylosis, cervical region."  (Id.

¶ 167; Pl. 56.1 Counterstmt. ¶ 167.)   Plaintiff asked him for narcotics.  (Def. 56.1 Stmt. ¶ 169.)

Plaintiff then treated with Dr. Karen Avanesov, D.O., on September 26, 2016, and complained of neck pain radiating to both arms.  (Id. ¶ 170.)  Plaintiff told Dr. Avanesov that she "was in [a] normal s[t]ate of health prior to an accident" and that she had a history of neck pain "about 5 years ago" with complete resolution of symptoms.  (Id. ¶ 171.)  An x-ray of the thoracic spine appeared normal.  (Id. ¶ 172.)  Dr. Avanesov assessed C5-7 cervical disc herniation and cervical radiculopathy, and noted that Plaintiff's failure with non-operative care rendered her a candidate for C5-7 anterior cervical discectomy and interbody fusion.  (Id. ¶ 173.)

Plaintiff returned to Dr. Burducea several times throughout October and November 2016.  She complained of pain in the mid-back, right shoulder, neck, and cervical area, as well as pain radiating down the right shoulder, hands, and thumb.  (Id. ¶ 174; Pl. 56.1 Counterstmt. ¶ 174.)   Dr. Burducea assessed cervical region spondylosis, cervicalgia, and cervical disc disorder with radiculopathy.  (Def. 56.1 Stmt. ¶ 175.)  Although Dr. Burducea advised Plaintiff to do physical therapy, Plaintiff did not attend.  (Id. ¶¶ 175-76.)  Plaintiff's lumbar spine was normal with full range of motion throughout October 2016.  (Id. ¶ 178.)  Then, in November 2016, Plaintiff complained of lumbar

and neck pain, and pain radiating down her arms to her hands.  (Id. ¶ 179.)  Dr. Burducea assessed intervertebral disc disorders with radiculopathy of the lumbar region and low back pain, and he administered a lumbar steroid transforaminal epidural at L4 and L5.  (Id. ¶¶ 180-81.)

On November 14, 2016 and January 9, 2017, Plaintiff complained to Dr. Avanesov of neck pain radiating into her arms. (Id. ¶¶ 182, 184.)  Dr. Avanesov assessed cervical region radiculopathy, cervical disc displacement, cervicalgia, cervical disc disorder with radiculopathy, low back pain, thoracic spine pain, and intervertebral disc disorders with radiculopathy in the lumbar region.  (Id. ¶¶ 183, 185.)  During both visits, Dr. Avanesov performed physical exams that revealed Plaintiff's range of motion was limited in the cervical spine.  (Pl. 56.1 Counterstmt. ¶¶ 182, 184.)

Dr. Avanesov performed an anterior cervical discectomy and intervertebral fusion at C5-6 and C6-7 on February 2, 2017. (Def. 56.1 Stmt. ¶ 187.)  Plaintiff's pre-operative diagnosis was: "C5-6, C6-7 posterior cervical disk herniation; cervical radiculopathy; axial neck pain; upper extremity neurological insult; and cervical spine stenosis.  Her postoperative diagnosis was the same."  (Id. ¶ 188.)  The operative report also noted "posterior cervical disc herniation with annular tear, extruded disc fragment, central cord compression, as well as neural

16

foraminal and lateral recess compression from extruded fragment."
(Pl. 56.1 Counterstmt. ¶ 188.)

Plaintiff next treated with Vadim Lerman, D.O., on
February 10, 2017 with complaints of neck and mid-low back pain.
(Def. 56.1 Stmt. ¶ 189.)  She also complained that "sleeping in
the wrong position makes the pain worse." (Id. ¶ 190.)  Dr. Lerman
assessed cervical region radiculopathy, cervical disc
displacement, cervicalgia, cervical disc disorder with
radiculopathy, intervertebral disc disorders with radiculopathy in
the lumbar region, and low back pain.  (Id. ¶ 191.)  Since it had
only been one week after Plaintiff's operation, Dr. Lerman expected
gradual improvement over the next few weeks, e.g., that Plaintiff
would resume driving in two to three weeks and be able to return
to full activity within four to six weeks.  (Id. ¶ 192.)

On March 6, 2017, Plaintiff followed up with Dr. Avanesov
with complaints of increased pain due to sleeping on her neck
wrong.  (Pl. 56.1 Counterstmt. ¶ 193.)  Dr. Avanesov assessed
cervical region radiculopathy, cervical disc displacement,
cervicalgia, cervical disc disorder with radiculopathy, and pain
in the thoracic spine.  (Id. ¶ 194.)  She also noted Plaintiff's
hand pain and numbness resolved after the surgery.  (Id. ¶ 195.)
Plaintiff returned to Dr. Avanesov in April and May 2017 with
similar neck pain complaints due to her sleeping position.  (Def.
56.1 Stmt. ¶¶ 196, 199.)  Then, in June 2017, Plaintiff complained

of neck pain as well as posterior neck tenderness and radiating mid-back pain to Dr. Avanesov. (Id. ¶ 203.) Dr. Avanesov assessed cervical disc displacement at C5-6 and C6-7, mid-cervical region disc displacement, and cervicalgia. (Id. ¶ 204.) In August 2017, Plaintiff reported that her neck pain was improving, but her complaints of posterior neck tenderness persisted. (Id. ¶ 208.) At this time, Dr. Avanesov assessed cervical region radiculopathy, cervicalgia, intervertebral disc disorders with radiculopathy in lumbar region, and low back pain. (Id. ¶ 209.)

Plaintiff began treating with a new pain management doctor, Vitaliy Zhivotenko, D.O., on December 22, 2017. (Id. ¶ 214.) She complained of neck and lower back pain, with the neck pain rated as a seven out of ten. (Id.) She also reported that "she was in a normal state of health up until the August 31, 2015 accident." (Id. ¶ 215.) Dr. Zhivotenko assessed "postlaminectomy syndrome, other cervical disc displacement, cervical region radiculopathy, other intervertebral disc displacement, lumbar region and lumbosacral, and long term (current) use of opiate analgesics." (Id. ¶ 216.) He also performed a physical examination and noted tenderness and muscle spasms in the neck/cervical region. (Pl. 56.1 Counterstmt. ¶ 216.)

Plaintiff began treating with another physician, Leon Reyfman, M.D., FIPP, RpH, in January 2018 due to neck and lower back pain. (Def. 56.1 Stmt. ¶ 217.) Dr. Reyfman assessed

postlaminectomy syndrome, other cervical disc displacement, cervical region radiculopathy, and lumbar region and lumbosacral intervertebral disc displacement. (Id. ¶ 219.) He also noted similar findings as Dr. Zhivotenko upon physical examination of Plaintiff. (Pl. 56.1 Counterstmt. ¶ 219.) An MRI scan of Plaintiff's cervical spine taken that same month revealed a C5 screw showed signs of early loosening and the presence of degenerative osteophytes. (Def. 56.1 Stmt. ¶ 220.) The report on the MRI also noted a thin lucency around the screw in the C5 vertebral body was present and may indicate early loosening; and that bony union could not be demonstrated. (Pl. 56.1 Counterstmt. ¶ 220.) Plaintiff returned to Dr. Reyfman on February 2, 2018, and his diagnoses did not change from his in January 2018 assessments. (Def. 56.1 Stmt. ¶ 221.)

<u>PROCEDURAL HISTORY</u>

Plaintiff commenced the instant case against Defendant on April 28, 2017, seeking $10 million in damages for injuries she allegedly sustained as a result of the August 2015 accident. (See generally Compl., ECF No. 1.) Defendant filed an Answer to the Complaint on August 22, 2017, and the parties proceeded to discovery. (Answer, ECF No. 11.) The instant motions followed.

ANALYSIS

I.  Legal Standard

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Material facts are those which might affect the outcome of the suit under the governing law, and a dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Wagner v. Chiari & Ilecki, LLP, 973 F.3d 154, 164 (2d Cir. 2020) (quoting Coppola v. Bear Stearns & Co., 499 F.3d 144, 148 (2d Cir. 2007)) (internal quotation marks omitted). The movant bears the burden of establishing that there are no genuine issues of material fact. CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP, 735 F.3d 114, 123 (2d Cir. 2013). Once the movant makes such a showing, the non-movant must proffer specific facts demonstrating "a genuine issue for trial." Giglio v. Buonnadonna Shoprite LLC, No. 06-CV-5191, 2009 WL 3150431, at *4 (E.D.N.Y. Sept. 25, 2009) (internal quotation marks and citation omitted). Conclusory allegations or denials will not defeat summary judgment. Id.

In reviewing the record, "the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Sheet Metal Workers' Nat'l Pension Fund v. Vadaris Tech.

Inc., No. 13-CV-5286, 2015 WL 6449420, at *2 (E.D.N.Y. Oct. 23, 2015) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997)).  The Court considers the "pleadings, deposition testimony, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits."  Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011).

## II.  Discussion

The Federal Torts Claims Act ("FTCA") authorizes a plaintiff to "to bring certain state-law tort suits against the Federal Government."  See Brownback v. King, 141 S. Ct. 740, 745-46 (2021).  A claim arising under the FTCA is actionable where it is:

> [1] against the United States, [2] for money damages, . . . [3] for injury or loss of property, or personal injury or death [4] caused by the negligent or wrongful act or omission of any employee of the Government [5] while acting within the scope of [their] office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

Id. at 746 (quoting FDIC v. Meyer, 510 U.S. 471, 475-476 (1994)).  State law is "the source of substantive liability under the FTCA."  Liranzo v. United States, 690 F.3d 78, 86 (2d Cir. 2012) (quoting Meyer, 510 U.S. at 478).  As such, the Government's "liability is determined by the law of the state where the accident occurred."  Berroa v. United States, No. 07-CV-3521, 2010 WL 532862, at *3

(S.D.N.Y. Feb. 5, 2010) (citing <u>Patrello v. United States</u>, 757 F. Supp. 216, 218 (S.D.N.Y. 1991)).

Here, the parties agree that the underlying accident occurred in New York and that New York law governs Plaintiff's claims.  <u>See</u> <u>Avlontis v. United States</u>, No. 16-CV-2521, 2020 WL 1227164, at *5 (E.D.N.Y. Mar. 13, 2020) ("Because the motor vehicle collision underlying this action occurred in New York, New York tort law applies." (quoting <u>Hyacinthe v. United States</u>, No. 05-CV-1363, 2009 WL 4016518, at *6 (E.D.N.Y. Nov. 19, 2009))). Pursuant to New York law, a plaintiff must demonstrate, by a preponderance of the evidence, three elements to prevail on a negligence claim:  (1) "the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof." <u>Comba v. United States</u>, 535 F. Supp. 3d 97, 105 (E.D.N.Y. 2021) (quoting <u>Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.</u>, 737 F.3d 166, 177 (2d Cir. 2013)).

Here, Plaintiff moves for summary judgment "as to the issue of liability." (<u>See</u> Pl. Mot. at 1.)  Defendant cross-moves for summary judgment on damages and causation. (<u>See</u> Def. Mot. at 1.)  The Court will now address each of the parties' motions in turn.

A.   <u>Liability</u>

"New York courts have long recognized that '[a] rear-end collision with a stopped or stopping vehicle creates a prima

facie case of liability with respect to the operator of the rearmost vehicle.'" Comba, 535 F. Supp. 3d at 105 (quoting Filippazzo v. Santiago, 277 A.D.2d 419, 419, 716 N.Y.S.2d 710 (2000)). In such cases, the defendant bears the burden of providing "a non-negligent explanation of the collision in order to overcome the inference of negligence and defeat the motion for summary judgment." Luizzi v. Pro Transp. Inc., No. 02-CV-5388, 2009 WL 252076, at *4 (E.D.N.Y. Feb. 2, 2009); Cajas-Romero v. Ward, 965 N.Y.S.2d 559, 561 (N.Y. 2013). Accepted examples of "non-negligent explanations" include mechanical failure of the rearmost vehicle, a sudden stop of the lead vehicle, and unavoidable skidding on wet pavement. See Comba, 535 F. Supp. 3d at 106 (citing Filippazzo, 277 A.D.2d at 419, 716 N.Y.S.2d 710).

Defendant contends that the parties' varying testimony as to how the accident occurred constitutes a material issue of fact that precludes summary judgment on the issue of liability. The Court disagrees. Regardless of whether the accident occurred while Plaintiff was at the stop sign or while she was in the middle of the intersection, the parties' testimony is clear that Plaintiff's vehicle was at a stop at the time of the collision.[2]

---

[2] Although Defendant argues that this case does not involve a rear-end accident with a stopped vehicle, Defendant contradicts itself in its opposition papers through the testimony it cites by stating: "[Daley's] testimony further establishes that he had sufficient time to at least attempt to avoid contacting Plaintiff's vehicle

This fact in and of itself establishes a prima facie case of negligence.

Defendant then argues that Plaintiff brought her vehicle to a sudden stop in an attempt to establish a non-negligent explanation for the collision.[3]  On this issue, Defendant submits "it was not reasonably foreseeable that Plaintiff would stop at the stop sign at a four-way intersection, start to proceed through that intersection, and then stop suddenly partway through that intersection." (Def. Opp'n at 7-8.)  Although "a driver . . . has the duty 'not to stop suddenly or slow down without proper signaling so as to avoid a collision,'" see Chepel v. Meyers, 762 N.Y.S.2d 95, 97 (N.Y. App. Div. 2d Dep't 2003) (quoting Purcell v. Axelsen, 729 N.Y.S.2d 495, 496 (N.Y. App. Div. 2d Dep't 2001)), "[i]t is well established that when the driver of an automobile approaches another automobile from the rear, he or she is bound to maintain a reasonably safe rate of speed and control over his or her vehicle, and to exercise reasonable care to avoid colliding with the other vehicle." Id.  None of the cases cited by Defendant in its opposition address this latter principle regarding the

---

by braking after she stopped suddenly in the intersection." (Def. Opp'n at 8 (citing Daley Tr. at 62-63) (emphasis added).)

[3] Notably, Defendant does not attempt to argue the accident was caused, in part, due to wet pavement despite the fact that Daley testified there was a "slight drizzle" on the day of incident. (See Pl. 56.1 Stmt. ¶ 27 (citing Daley Depo. Tr. at 36-37).)

obligations of the driver of the rear vehicle.  "[I]n the absence of any evidence that the defendant was maintaining a reasonably safe distance and speed behind the plaintiff's vehicle as required by Vehicle and Traffic Law § 1129 (a), [defendant's] claim that the plaintiff's vehicle came to a sudden stop [i]s insufficient to raise a triable issue of fact as to whether there was a nonnegligent explanation for the collision."  Hackney v. Monge, 960 N.Y.S.2d 176, 178 (N.Y. App. Div. 2d Dep't 2013).  Thus, if the Court were to credit Daley's version of the underlying incident, he was travelling one half of a car length behind Plaintiff at a speed of approximately 15 to 20 miles per hour before Plaintiff suddenly stopped in the intersection.  Then, despite his efforts to avoid a collision by applying his brakes, Daley was unable to stop in time.

The Court finds Cajas-Romero v. Ward to be instructive. 965 N.Y.S.2d 559, 562 (N.Y. App. Div. 2d Dep't 2013).  In Cajas-Romero, the defendant was stopped behind the plaintiff at a red light.  Id. at 852.  After the light turned green, the plaintiffs proceeded into the intersection and the defendant followed behind at a rate of speed of approximately five miles per hour.  Id.  The defendant stated that a third vehicle "cut off" the plaintiffs causing the plaintiffs to bring their vehicle to a sudden stop, and the defendant was unable to bring his vehicle to a stop in time to prevent a collision with the plaintiffs.  Id.  Similar to

the instant case, the parties in Cajas-Romero had differing accounts of the circumstances leading up to the accident. See id. Notwithstanding, the court accepted the defendant's version of the events as true and found that the defendant failed to create a triable issue of fact by establishing a non-negligent explanation for the collision. Id. The court based its holding upon the fact that "the defendant was traveling extremely close behind the plaintiffs' vehicle without leaving . . . a reasonably safe distance from the plaintiffs' vehicle." Id. Similar to the defendant in Cajas-Romero, Daley likewise travelled very closely behind Plaintiff's vehicle as she proceeded into the intersection. This, coupled with the fact that Daley was travelling at a greater speed behind Plaintiff than the Cajas-Romero defendant travelled behind the plaintiff in that case, supports the conclusion that Daley failed to maintain a reasonably safe distance and speed behind Plaintiff. Accordingly, the Court does not find there to be an issue of fact regarding the existence of a non-negligent explanation for the accident. Therefore, Plaintiff's motion for summary judgment on the issue of liability is GRANTED.

    B.   Damages

New York's "No-Fault Law" "'places limits on any recovery by a person involved in an automobile accident,' providing recovery only for (a) economic losses beyond the 'basic economic loss' threshold and (b) non-economic losses arising from 'serious

injury.'"  See Comba, 535 F. Supp. 3d at 106 (quoting N.Y. Ins. L. §§ 5102, 5104).  Plaintiff does not argue that she has suffered economic losses and instead focuses solely on her claim for damages based upon non-economic losses.  Moreover, in her Local Rule 56.1 Counterstatement of Facts, Plaintiff admits that she does not have a claim for lost wages nor a claim for out-of-pocket medical expenses.  (See Pl. 56.1 Counterstmt. ¶¶ 247-48.)  As such, the Court will focus on whether Plaintiff has suffered from a non-economic loss stemming from a "serious injury."

> The No-Fault Law defines a "serious injury" as:
>
> A personal injury which results in [1] death; [2] dismemberment; [3] significant disfigurement; [4] a fracture; [5] loss of a fetus; [6] permanent loss of use of a body organ, member, function or system; [7] permanent consequential limitation of use of a body organ or member; [8] significant limitation of use of a body function or system; or [9] a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment.

N.Y. Ins. L. § 5102(d).  As the summary judgment movant, the defendant "must establish a prima facie case that plaintiff did not sustain a 'serious injury' within the meaning of Insurance Law § 5102(d)."  Yong Qin Luo v. Mikel, 625 F.3d 772, 777 (2d Cir. 2010) (quoting Barth v. Harris, No. 00-CV-4189, 2001 WL 736802, at

*2 (S.D.N.Y. June 25, 2001)).  In support of its argument, a defendant "may rely on the unsworn reports by plaintiff's physicians, but must provide evidence from its own physicians in the form of sworn affidavits." Id.  After a defendant demonstrates its prima facie case, the burden shifts to the plaintiff to prove that she did sustain a serious injury.  See Comba, 535 F. Supp. 3d at 107.  A plaintiff can only satisfy this burden by offering "objective proof" of her injury; "[s]ubjective complaints of pain will not, standing alone, support a claim for serious injury." Yong Qin Luo, 625 F.3d at 777 (citing Son v. Lockwood, No. 07-CV-4189, 2008 WL 5111287, at *5-6 (E.D.N.Y. Nov. 26, 2008)).  A plaintiff must proffer evidence in the form of sworn affidavits by physicians.  Id.

Of the nine types of personal injuries that may constitute a "serious injury" pursuant to the No-Fault Law, only three are at issue here:  (1) permanent consequential limitation of use of a body part or organ; (2) significant limitation of use of a body part or organ; and (3) a non-permanent injury that prevents performance of customarily daily activities for not less than 90 days during the 180 days following the occurrence of the injury, also known as a "90/180 Claim."  (See Pl. Opp'n at 10.) Plaintiff claims she sustained personal injuries to her neck/cervical spine and mid-back/thoracic spine as a result of the accident.  (Id. at 2.)  In particular, Plaintiff contends the

accident "caused an aggravation and/or exacerbation of [her] pre-existing condition in her cervical spine, which progressively worsened and ultimately necessitated an anterior cervical discectomy and fusion surgical procedure to her cervical spine." (Id.)[4]  The Court will now assess whether Plaintiff's injuries are sufficiently "serious."

> 1. Permanent Consequential Limitation and Significant Limitation

Injuries based upon "permanent consequential limitation" and "significant limitation" are often considered together. See Avlonitis v. United States, No. 16-CV-2521, 2020 WL 1227164, at *6 (E.D.N.Y. Mar. 13, 2020) (citing Williams v. United States, No. 09-CV-0933, 2014 WL 11460892, at *8 (N.D.N.Y. Jan. 28, 2014), aff'd, 597 F. App'x 647 (2d Cir. 2015)).  "With the exception that the plaintiff prove permanence to satisfy the 'consequential limitation' definition, 'significant limitation' is essentially identical." Id.  "[W]hether a limitation of use or function is 'significant' or 'consequential' (i.e., important) relates to medical significance and involves a comparative determination of

---

[4] Plaintiff has "withdrawn any claim of injury to her lumbar spine and her bilateral extremities." (Id. at 2 n.2.)  In a similar vein, Defendant argues that Plaintiff has abandoned any claim of injury to her thoracic spine as well because "Plaintiff has not even attempted to raise any triable issue of fact with respect to [such] a purported injury" and has submitted no expert evidence on this issue. (Def. Reply at 6.)  The Court agrees with Defendant, and, consequently, will only consider Plaintiff's claims for "serious injury" as they relate to her cervical spine.

the degree or qualitative nature of an injury based on the normal function, purpose and use of the body part." Avlonitis, 2020 WL 1227164, at *6 (quoting Toure v. Avis Rent A Car Sys., Inc., 774 N.E.2d 1197, 1201 (N.Y. 2002)). "Thus, a plaintiff must demonstrate 'something more than . . . a minor, mild or slight limitation of use.'" Id. (quoting Ventra v. United States, 121 F. Supp. 2d 326, 333 (S.D.N.Y. 2000)). To support such a claim, a plaintiff "must present objective medical evidence." Id. (quoting Seales v. United States, No. 15-CV-6969, 2019 WL 7753451, at *24 (E.D.N.Y. Oct. 21, 2019)).

Defendant meets its initial burden to demonstrate that Plaintiff failed to sustain a "serious injury" by citing to the sworn declaration and report of its expert, Dr. Robert Goldberg, D.O. (See Def. Mot. at 10-13; Goldberg Decl., ECF No. 43-14; Goldberg Rpt., ECF No. 43-15.) After reviewing Plaintiff's medical records that pre- and post-dated the accident, Dr. Goldberg opined that Plaintiff's "current cervical spine symptoms pre-existed the accident an[d] there is no objective evidence that her symptoms were exacerbated as a result of the accident. The findings after the accident are expected as a result of degenerative disc disease and would have been the same regardless of the accident." (Goldberg Decl. ¶ 21; Goldberg Rpt. at 1-2.) He examined Plaintiff on February 16, 2018 and assessed Plaintiff's cervical spine range of motion to be normal, except that the "active passive range of

motion of the arms is mildly impaired," and that his observations and findings "show the normal expected function for this individual, and do not suggest any medical impairment." (Goldberg Decl. ¶ 13.)   In particular, his testing revealed: flexion of 40 degrees (normal is 45 degrees); extension of 40 degrees (normal is 50 degrees); right side bending of 40 degrees (normal is 45 degrees); left side bending of 35 degrees (normal is 45 degrees); and right and left rotation of 60 degrees (normal is 80 degrees). (Id. ¶ 13.)   He noted that since 2013, Plaintiff has been "prescribed opiates by a number of different providers [for neck and back pain], and after the subject accident[,] her narcotic dose [did] not change." (Goldberg Rpt. at 13.)   In conclusion, he stated that "Plaintiff is not disabled and does not have any substantial limitations as a result of the accident." (Goldberg Decl. ¶ 23; see also Goldberg Rpt. at 13 ("Ms. Turansky-Frances is not disabled from her usual work as a result of the subject accident.").)

The burden now shifts to Plaintiff to create a genuine issue of material fact as to whether she suffered a permanent consequential and/or significant limitation as a result of the accident.   Plaintiff argues that the motor vehicle collision aggravated and exacerbated her pre-existing condition in her cervical spine which progressively worsened and ultimately required an anterior cervical discectomy and fusion surgical

procedure.   (See Pl. Opp'n at 2.)   In support of this argument,
Plaintiff relies upon her own complaints of pain and, more
importantly, the expert opinion of Dr. Avanesov, who began treating
Plaintiff on September 26, 2016.   (Id. at 4, 21-22.)   Dr. Avanesov
opined that Plaintiff "may demonstrate some fluctuations in her
ranges of motion, largely due to her course of treatment and use
of pain medications, [but] it is clear that [Plaintiff] continues
to suffer from a significantly reduced range of motion to her
cervical spine." (Avanesov Decl., ECF No. 49-3, ¶ 22.)   During an
examination on November 21, 2018, Dr. Avanesov's testing of
Plaintiff's range of motion in the cervical spine revealed: flexion
of 30 degrees (normal is 50 degrees); extension of 30 degrees
(normal is 60 degrees); right lateral rotation of 40 degrees
(normal is 80 degrees); and left lateral rotation of 45 degrees
(normal is 80 degrees).   (Id. ¶ 15.)   Then, noting Plaintiff's
pre-existing cervical spine condition, Dr. Avanesov found that
Plaintiff's C5-6 and C6-7 levels were aggravated and exacerbated
as a result of the accident which resulted in spinal cord
impingements, nerve root impingements, and nerve root
encroachments.   (Id.)   She explicitly "disagree[d] with Dr.
Goldberg's opinions," noting that Plaintiff was receiving
intermittent conservative treatment for her pre-existing
condition, and that Plaintiff's condition could no longer be
managed with "just conservative treatment" following the accident.

(Id. ¶ 21.)  In sum Dr. Avanesov stated that, with a reasonable degree of medical certainty, Plaintiff's cervical spine condition was aggravated and/or exacerbated by the accident, resulting in "significant permanent total and quantifiable loss of use and function of her cervical spine." (Id. ¶ 22.)  She also "expect[s] over time an accelerated degeneration of her injuries with concomitant decreased range of motion." (Id.)  Dr. Avanesov's observations derive from, inter alia, several of Plaintiff's visits to her office, during which Plaintiff consistently complained of neck and cervical spine pain (see, e.g., id. ¶¶ 3-4, 7), the cervical spine surgery she performed on Plaintiff (id. ¶ 10), and her review of Plaintiff's medical records and MRIs from before and after the accident (id. ¶¶ 16-21).

        "Viewing the evidence in the light most favorable to the non-movant, as the Court must do on summary judgment, Plaintiff has successfully rebutted Defendant's prima facie case." Comba, 535 F. Supp. 3d at 110.  Dr. Avanesov's opinion reflects a "'qualitative assessment of [P]laintiff's condition' built upon 'an objective basis' that compares her 'limitations to the normal function, purpose, and use'" of the cervical spine. Id. (alteration in original) (quoting Yong Qin Luo, 625 F.3d at 777). Although "[t]here is no set percentage for determining whether a restricted range of motion establishes a permanent consequential or significant limitation," courts have determined that "a

limitation of twenty percent or more is significant for summary judgment purposes." Oz v. Lorowitz, No. 09-CV-5532, 2012 WL 4560460, at *4 (S.D.N.Y. Sept. 30, 2012) (quoting Hodder v. United States, 328 F. Supp. 2d 335, 356 (E.D.N.Y. 2004)). Here, Plaintiff has demonstrated, through Dr. Avanesov's findings, that her range of motion is limited by more than 20 degrees. (See Avanesov Decl. ¶ 15.) These limitations described by Dr. Avanesov, coupled with her opinion that the accident caused the exacerbation of Plaintiff's injuries, which are permanent and progressive in nature, and will continue to degenerate at an accelerated rate, are "significant" for summary judgment purposes. See Kim v. Stewart, No. 18-CV-2500, 2021 WL 1105564, at *7 (S.D.N.Y. Mar. 23, 2021) ("Dr. Yoo documented on May 9, 2019, more than three years following the 2015 Accident, limitations greater than twenty percent to Kim's forward shoulder elevation (143 degrees in comparison to 180 degrees) and to external rotation (37 degrees compared to 90 degrees). These limitations are 'significant' for purposes of summary judgment, especially in conjunction with Dr. Yoo's conclusions that Kim will have permanent right shoulder pain, increased with motion and activity, and will be prone to developing degenerative joint disease. . . . Based on this opinion, in conjunction with the results of MRI and range of motion studies, as well as the sworn affidavit of his treating physician, the Court finds that Kim has demonstrated a genuine issue of material fact

whether he suffered a permanent consequential limitation of use of his body organ or member." (citing Gonzalez v. Butrago, No. 00-CV-5749, 2001 WL 461009, at *1 (S.D.N.Y. May 1, 2001)) (cleaned up)); see also Oz, 2012 WL 4560460, at *6 ("The Court finds the medical evidence submitted by Plaintiff -- both quantitative and qualitative -- to be credible and that it amply supports Plaintiff's claim that he has suffered more than a mild or slight limitation of his cervical spine.  Indeed, the evidence that Plaintiff has lost a twenty-degree range in motion in his cervical spine, that his herniated discs are permanent, and that he will suffer permanent pain as a result of the accident is sufficient for a jury to conclude that Plaintiff suffers from a permanent consequential limitation or significant limitation in his cervical spine.").

The Court is not persuaded by Defendant's arguments to discredit Dr. Avanesov's findings in an attempt to show that Plaintiff has failed to raise a material issue of fact. (See Def. Reply at 4-6.)  "Defendant[], in effect, ask[s] the Court to make a credibility determination and disregard certain evidence, but it is well established that '[a]ssessments of credibility and choices between conflicting versions of events are matters for the jury, not for the [C]ourt on summary judgment.'"  Kim, 2021 WL 1105564, at *7 (third alteration in original)(quoting Simpson v. City of New York, 793 F.3d 259, 265 (2d Cir. 2015)).  "Fundamentally, the

fact that the parties submitted 'contradicting medical affirmations . . . in connection with this motion merely establishes a battle of the experts,'" which "underscores the conclusion that [Plaintiff] has presented sufficient evidence to raise a genuine issue of material fact." Id. (quoting Klein v. Goldfarb, No. 03-CV-0874, 2004 WL 551219, at *1 (S.D.N.Y. Mar. 22, 2004)) (cleaned up).

2.   90/180 Category

The last type of "serious injury" defined by Section 5102(d), the "90/180 Category," "calls for injuries or impairment to 'prevent[] the injured person from performing substantially all of' the person's usual and customary daily activities' for at least 90 days during the first 180 days immediately after the accident." Comba, 535 F. Supp. 3d at 110-11 (quoting N.Y. Ins. L. § 5102(d)). Pursuant to the 90/180 Category, "substantially all" is "construed to mean that the person has been curtailed from performing his usual activities to a great extent rather than some slight curtailment." Kim, 2021 WL 1105564, at *6 (quoting Licari v. Eliot, 57 N.Y.2d 230, 236 (N.Y. 1982)). "A plaintiff's inability to work is sufficient alone to make out a prima facie 90/180 Category claim . . . ." Id. (citing Mercado v. Lee, No. 04-CV-7166, 2008 WL 4963985, at *5 (S.D.N.Y. Nov. 21, 2008)).

The Court agrees with Defendant that Plaintiff's injuries do not fit within the 90/180 Category.  Plaintiff missed

no work due to her injuries because the last time Plaintiff worked was in May 2014, which pre-dates the August 2015 accident. (See Turansky-Frances Depo. Tr., ECF No. 45-7, at 13.) Moreover, Plaintiff points to no evidence suggesting "she was prevented from performing any daily activities." Comba, 535 F. Supp. 3d at 111 (emphasis in original). Plaintiff's general contentions that she "continues to complain of cervical pain and limitations" which "affect her everyday life and her ability to function as she did prior to the accident" (see Pl. Opp'n at 21-22), are "far too nebulous to pass muster on summary judgment." Comba, 535 F. Supp. 3d at 111.

Although Plaintiff does not elaborate as to how her daily activities have been affected as a result of the accident in her opposition, the Court notes that, during her deposition, Plaintiff testified that her daily activities prior to the accident consisted of "getting her [daughter] to school[,] . . . a lot of driving around, running around, cooking, cleaning, [and] laundry in between shopping. (Turansky-Frances Depo. Tr. at 16.) Then, after the accident, Plaintiff stated that she has difficulty bathing herself and is unable to lift her arms over her head. (Id. at 84.) She is able to get in and out of bed, "carefully" go up and down stairs, drive her car, help her daughter with activities, and grocery shop "with assistance." (Id. at 85.) When she shops, Plaintiff now drops bags and is unable to "get big loads like [she]

used to." (Id.) As to housework, Plaintiff needs help cleaning, cannot reach comfortably, is unable to garden, and cannot cook with big heavy pans anymore. (Id. at 86.) She also has difficulty sleeping and needs "to have a certain amount of pillows arranged just right." (Id. at 87-88.) However, this slight curtailment of Plaintiff's usual activities is insufficient to overcome summary judgment as to a "serious injury" premised upon the 90/180 Category.

### C.   Causation

"As a final hurdle," a plaintiff must demonstrate that her "serious injury" was proximately caused by the accident at issue. Comba, 535 F. Supp. 3d at 111 (citing Carter v. Full Serv., Inc., 815 N.Y.S.2d 41, 43 (N.Y. App. Div. 1st Dep't 2006)). The defendant bears the initial burden on this issue and must demonstrate "additional contributory factors interrupt the chain of causation between the accident and claimed injury -- such as a gap in treatment, an intervening medical problem or a preexisting condition." Pommells v. Perez, 4 N.Y.3d 566, 572 (N.Y. 2005). The burden then shifts to the plaintiff "'to come forward with evidence addressing the defendant's claimed lack of causation; if the plaintiff fails to meet that burden, the defendant is entitled' to summary judgment." Comba, 535 F. Supp. 3d at 111 (quoting Arenes v. Mercedes Benz Credit Corp., 2006 WL 1517756, at *8 (E.D.N.Y. June 1, 2006)).

The fact that Plaintiff had pre-existing conditions, such as a degenerative disc disease, does not preclude a finding that the accident caused her a serious injury through the exacerbation of those conditions.  See Burzynski v. United States, No. 13-CV-766S, 2016 WL 6298513, at *7 (W.D.N.Y. Oct. 27, 2016) ("And even if Plaintiff had some amount of pre-existing degenerative disc disease, that alone is not sufficient to show that there is no causal link between the collision and an exacerbation of Plaintiff's condition."); see also Nasrallah v. Helio De, No. 96-CV-8727, 1998 WL 152568, at *8 (S.D.N.Y. Apr. 2, 1998) ("[T]he fact that Mr. Nasrallah already had degenerative disc disease does not prevent an accident from causing serious injury by aggravating this condition.") (Sotomayor, J.).

Based upon the Court's review of the record, and as set forth above, both Plaintiff's expert, Dr. Avanesov, and Defendant's expert, Dr. Goldberg, rely on the same evidence to reach opposite conclusions as to the seriousness of Plaintiff's injuries and whether those injuries were proximately caused by the underlying accident.  To resolve this battle of the experts would exceed the Court's role at the summary judgment stage where it "is to identify issues of material fact, not to resolve them."  Chase v. Allawi, No. 07-CV-0096, 2010 WL 1133333, at *6 (W.D.N.Y. Mar. 23, 2010).  Accordingly, these material issues of fact are to be tried by a jury.

CONCLUSION

For the stated reasons, **IT IS HEREBY ORDERED** that Plaintiff's motion for summary judgment (ECF No. 45) is GRANTED as to the issue of liability.  Defendant's cross-motion for summary judgment (ECF No. 42) is GRANTED to the extent Plaintiff's injuries do not satisfy the 90/180 Category and DENIED in all other respects.  The parties are directed to submit a proposed joint pre-trial order to Magistrate Judge Arlene R. Lindsay within thirty (30) days of the date of this Memorandum & Order.


SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: March 31, 2022
       Central Islip, New York